STERLING v. HAM, Collector of Internal Revenue.

District Court, D. Maine, S. D.
May 6, 1933.

·Locke, Perkins & Williamson, of Augusta, Me., for plaintiff.

William B. Nulty, Asst. U. S. Atty., of Portland, Me., for defendant.

PETERS, District Judge.

This action is brought to recover the sum of $3,436.32 paid by the plaintiff for income taxes, penalty, and interest for the year 1926.

From the provisions of a stipulation between the parties, it appears that the plaintiff is properly in court and a jury waived.

The plaintiff and others associated with him sold certain lands in 1926 to the Central Maine Power Company, a corporation agreed to have been then and subsequently financially sound. Payment of a part of the purchase price of each parcel was deferred for about five years without interest. The method of treatment of the deferred payments in relation to the income of the plaintiff for the year of the sale constitutes the dispute between the parties.

The record title to one of the parcels sold by the plaintiff, called his Homestead Farm, turned out to be in a mortgagee who had foreclosed the mortgage some years previously without disturbing the possession of the plaintiff. When the matter of title became vital, the plaintiff made arrangements to purchase it from the mortgagee, and out of the cash payment of $10,796 made on this parcel by the power company, $10,000 was paid directly to the mortgagee on account of the repurchase price agreed upon with the plaintiff.

The plaintiff urges that, as this sum of $10,000 did not actually pass through his hands, he should not be charged with it, and that therefore he received from the initial payment less than 25 per cent. of the sale price and would be entitled to treat the sale of the Homestead Farm as an installment sale under the statute and regulations hereinafter referred to.

This contention cannot be sustained for the reason that the payment to the mortgagee, made at the direction and for the benefit of the plaintiff, had the same effect as if made to him and then passed by him to the mortgagee. In respect of this payment, the attorney handling the distribution of the money clearly acted as agent of the plaintiff.

It follows that the sale of the interest of the plaintiff in the three parcels was a deferred-payment sale falling within classification (2) of Treasury Regulations 44 and 46 under section 212(d), Revenue Act of 1926 (26 USCA § 953(d):

"(2) Deferred-payment sales not on the installment plan, that is, sales in which the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable year in which the sale is made exceed one-fourth of the purchase price.

"Sales falling within class (1) and class (2) alike include (a) agreements of purchase and sale which contemplate that a conveyance is not to be made at the outset, but only after all or a substantial portion of the purchase price has been paid, and (b) sales where there is an immediate transfer of title, the vendor being protected by a mortgage or other lien as to deferred payments.

"In transactions included in class (2) in article 44 the obligations of the purchaser received by the vendor are to be considered as the equivalent of cash to the amount of their fair market value in ascertaining the profit or loss from the transaction."

The total amount payable to the plaintiff from his sale was $58,190, of which $14,-730.01 was paid to him in cash (including the $10,000 above mentioned), payment of the balance being deferred until work should be commenced on a certain dam in connection with the construction of which these and other lands were purchased, or, in any event, not later than July 1, 1931.

The deferred payments were not represented by any notes, bonds, or such evidence of indebtedness of the purchaser, a contract only being entered into called an "Indenture of Agreement and Trust," to which the plaintiff and four other vendors and a trust company, as trustee, were parties, which covered matters of future payments and many other details of a somewhat complicated transaction.

As the cash payments made to the plaintiff, when applied to the cost of the property sold, taken in connection with his exemptions, showed no tax due for 1926, he filed no return, but the Collector, investigating the tax liability of the plaintiff, in November, 1929, prepared a return for the signature of the plaintiff showing a tax due, with penalty and interest of $5,771.62.

To obtain this result the Collector applied the total purchase price, both cash and deferred noninterest bearing payments, to the cost of the property and figured the balance as profit. This was admittedly erroneous.

The tax thus assessed was not paid and a distraint order was issued. Thereupon the plaintiff, acting through his attorney, filed another return in which the payments agreed to be made not later than 1921, without interest, were commuted in value to the date of sale, and the reduced amount of tax, penalty, and interest, amounting to $3,436.32, was paid, claim for refund made, and this suit brought.

The only theory under which the plaintiff would be liable for any income tax for the year 1926 is that the indenture entered into between him, the other vendors, the purchaser, and the trustee, in that year, constituted an "obligation" of the purchaser having a "market value."

Is it such an "evidence of indebtedness" or "obligation" of the purchaser as is contemplated by the regulations above quoted?

The contract referred to was by no means a simple promise to pay, nor could the rights of the plaintiff under it be ascertained without evidence outside of the instrument itself, which, in twelve typewritten pages, undertook to establish the rights and obligations of the seven corporations and persons who were parties to it.

Title to the property was conveyed by all the vendors to the trust company, as trustee. Upon payment of certain sums of money to the trustee by the power company, the trustee undertook to pay the purchase price to the vendors of the several parcels (less the amount of charges and disbursements by the trustee), or to reconvey to them, if the money was not forthcoming.

The plaintiff owned one parcel individually, by way of the transactions of reconveyance above mentioned. The remaining two parcels he owned in common with others, but his interest was not specified in the contract. It seems that in the one case his ownership was one-half, while in the case of the parcel called the East Carrying Place, agreed to be conveyed by him and a corporation called the Northeastern Land Company, his interest was actually one-fourth; and, moreover, it was specified that all payments on account of this parcel were to be made to the Northeastern Land Company and not to the plaintiff at all.

The trustee was to be paid for its services and disbursements, but there was no specification of the amount or as to the method of its computation. One-half the trustee's fees were to be borne by the vendors.

So, here was a contract under which the plaintiff had an interest which was undefined, in a sum of money the amount of which could not be definitely ascertained, payable at an indeterminate date. Such a contract might be sold on a speculative basis, but probably

only to one who had previously investigated both the law and the facts and then guessed the amount accruing to the plaintiff under it.

The plaintiff had nothing negotiable. Whatever assignment he made to a purchaser would be subject to equities. No money was to come to him directly. All payments went first to the trust company, which well might have a claim against him, and as to the third parcel there is not even an agreement on the part of the Northeastern Land Company, to which the whole consideration was to be paid, that any part of it should go to the plaintiff.

I cannot think that this contract is such an "obligation(s) of the purchaser received by the vendor as to be considered as the equivalent of cash to the amount of its (their) fair market value." Market value in this connection obviously refers to ready convertibility into cash of some evidence of indebtedness like a promissory note. The plaintiff's obscure interest in this indenture could not possibly be thus used and should not be so treated. If a vendor has taken negotiable securities in part payment, the transaction is, in a way, settled and completed. His security can ordinarily be used to the amount of its fair value. There is reason and equity in considering that value a part of the income of the vendor for that year; but if not convertible into cash in any usual way, but only by chance or on a speculative basis, there is not only absent the element of cash value or market value referred to in the regulations, but it would be most inequitable to subject the taxpayer to the imposition of a tax on income he has neither received nor from which he can get any present benefit; as well as impossible to ascertain the value on which the tax could be imposed.

In the sense of the statute there is no market value, and, as testified to by the bankers who were witnesses, there is no market value from a point of view of banking or business. The fact that the bank of one of the witnesses, the trust company, trustee, to which the money was to be paid, made a loan to the plaintiff on an assignment of his interest in the contract is not inconsistent with the theory that only one familiar with the situation would be likely to engage in such a transaction.

The assessment of tax by the bureau is prima facie correct, as mentioned by counsel for the defendant, but I consider the burden resting on the plaintiff to be amply sustained. In fact, the position taken by the bureau appears to be directly contrary to the opinion of its general counsel quoted by plaintiff's counsel in his brief.

"The terms 'evidences of indebtedness of the purchaser' and 'obligations of the purchaser received by the vendor' as used in articles 44 and 46, respectively, clearly refer to something received by the vendor to represent the promise or promises to pay contained in the contract of sale. If, therefore, the deferred payments are not represented by notes or other like obligations of the purchaser, the cash received by a taxpayer on the cash receipts and disbursements basis should be applied against and reduce the basis of the property sold and, if it is in excess of such basis, the excess should be reported as profit. When the deferred payments are received they should be applied against the reduced basis, if the initial payment was not in excess of the basis, and the excess over the reduced basis or the total amount received, as the case may be, should be included in income for the year of receipt." (Internal Revenue Bulletin, Cumulative Bulletin VI-1, page 48.)

Several decisions by the Board of Tax Appeals appear to be in line with this view. Evans Case (1926) 5 B. T. Z. 806, Woodmar Realty Company (1929) 17 B. T. Z. 88.

By these rulings the government will not be deprived of its tax. The taxpayer is liable for it as of the date payment was received, not previously.

In the instant case it seems clear that where the taxpayer had nothing representing the agreement of the purchaser to pay except the contract itself, which obviously could not be sold or used except under special circumstances, he had nothing the fair market value of which was ascertainable, and that the tax was erroneously assessed and collected.

The result is that judgment must be rendered for the plaintiff for the sum of $3,436.-32, with interest at 6 per cent. from December 26, 1929. Judgment may be rendered accordingly.